THISSEN, Justice.
This case requires us to determine whether two Minnesota statutes- Minn. Stat. § 609.749, subd. 2(6) (2018), the stalking-by-mail provision, and Minn. Stat. § 609.795, subd. 1(3) (2018), known as the mail-harassment statute-are unconstitutional under the First Amendment to the United States Constitution. The juvenile court and the court of appeals concluded that both statutes are constitutional. We hold that Minn. Stat. § 609.749, subd. 2(6), is facially overbroad and not subject to either a narrowing construction or severance of unconstitutional provisions. Accordingly, we reverse the decision of the court of appeals with respect to that statute. We also hold that Minn. Stat. § 609.795, subd. 1(3), is facially overbroad, but that the statute can be saved through severance of the constitutionally problematic language. Finally, because it is unclear whether appellant's adjudication of delinquency for mail-harassment is based on the severed language, we reverse the adjudication under Minn. Stat. § 609.795, subd. 1(3), and remand to the juvenile court.
FACTS
In March 2016, three high school students, appellant A.J.B. and two friends, saw and discussed several tweets that fellow student M.B. had posted on the social media platform Twitter referencing girls at the school. In response, A.J.B. created an anonymous Twitter account and, in a two- to three-hour period, posted approximately 40 tweets about M.B. Nearly all of *845 the tweets "mentioned" M.B. by including his Twitter username in the tweet.[1] A.J.B.'s purpose was to elicit a negative response.
Essentially all of the tweets posted by A.J.B. and directed at M.B. contained cruel and egregious insults. One tweet contained a checkerboard of images with M.B.'s face and a caption reading, "Click the Autistic Child." Several tweets encouraged M.B. to commit suicide, encouraged M.B. to try a new cologne called "Anthrax," and suggested that M.B. kill himself by drinking bleach. Still other tweets referred to M.B. as a homosexual and used homophobic language, insults, and slurs, and called for the death penalty for gay individuals. Others insulted M.B.'s language skills, social skills, handwriting, personal interests, and involvement at school, and implied that his parents did not want him to be born. Put simply, over the course of two to three hours, A.J.B. dispatched an unrelenting torrent of cruel tweets at M.B.-an individual diagnosed with autism and Attention Deficit Hyperactivity Disorder-designed to "teach [him] a lesson." As the juvenile court put it, "[t]o say these posts are merely mean minimizes the degree of A.[J.]B.'s conduct ... [the posts] are cruel and go beyond any measure of human decency."
Several days later, A.J.B.'s tweets came to the attention of his high school's dean of students. The dean spoke to M.B. about the messages. M.B. had not yet seen the tweets, but when he viewed them, he became extremely upset. M.B. later testified that the tweets made him want to commit suicide and that he held a knife near his chest as a result. M.B. also testified that he was afraid to return to school for fear of being attacked. He sought the assistance of a psychiatrist and a social worker. After an internal school investigation, A.J.B. admitted to the dean that he created the anonymous Twitter account and sent the tweets that mentioned M.B.
A.J.B. was charged with one count of gross-misdemeanor stalking by use of the mail in violation of Minn. Stat. § 609.749, subd. 2(6), and one count of misdemeanor harassment by use of the mail in violation of Minn. Stat. § 609.795, subd. 1(3). A.J.B. filed a pretrial motion to dismiss the charges, arguing among other things that the statutes were facially unconstitutionally overbroad in violation of the First Amendment and as applied to him. The juvenile court denied his motion. Just prior to trial, the State filed an amended juvenile petition, charging A.J.B. with an additional count of felony stalking in violation of Minn. Stat. § 609.749, subd. 3(a)(1) (2018), which requires the same proof as the gross-misdemeanor stalking charge but with an added element of demonstrating that the stalking occurred because of the offender's bias toward the victim's disability.
A.J.B.'s case went to trial. He was found guilty beyond a reasonable doubt on all three charges and adjudicated delinquent of gross-misdemeanor stalking under Minn. Stat. § 609.749, subd. 2(6), and harassment by use of the mail under Minn. Stat. § 609.795, subd. 1(3).[2] In a published decision, the court of appeals rejected A.J.B.'s constitutional challenges and affirmed his adjudications for stalking by mail and mail harassment.
*846 In re A.J.B. , 910 N.W.2d 491, 502-03 (Minn. App. 2018). We granted A.J.B.'s petition for review.
ANALYSIS
On appeal, A.J.B. argues that his adjudications under the stalking-by-mail provision and mail-harassment statute must be vacated as contravening the First Amendment. Before turning to his specific arguments, we set out background principles that will guide our analysis. The First Amendment to the United States Constitution states that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. It applies to the states through the Fourteenth Amendment. State v. Washington-Davis , 881 N.W.2d 531, 538 (Minn. 2016) (citing 44 Liquormart, Inc. v. Rhode Island , 517 U.S. 484, 489 n.1, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) ).
"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its messages, its ideas, its subject matter, or its content." Ashcroft v. Am. Civil Liberties Union , 535 U.S. 564, 573, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002) (internal quotation marks omitted) (citation omitted). The Supreme Court has stated that the First Amendment does not permit "the Government to imprison any speaker [because] his speech is deemed valueless or unnecessary, or [because] an ad hoc calculus of cost and benefits tilts in the statute's favor." United States v. Stevens , 559 U.S. 460, 471, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010). Rather, the First Amendment "itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs" such that the "Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it." Id. at 470, 130 S.Ct. 1577. Further, "[o]f bedrock importance is the principle that the First Amendment's protections extend beyond expressions 'touching upon a matter of public concern.' " State v. Tracy , 200 Vt. 216, 130 A.3d 196, 201 (2015) (quoting Connick v. Myers , 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ).
Of course, First Amendment protections are not limitless. There is a point where First Amendment protections end and government regulation of speech or expressive conduct becomes permissible. Exceptions to First Amendment protections generally fall into several delineated categories that include speech or expressive conduct designed to "incite imminent lawless action," "obscenity," "defamation," "speech integral to criminal conduct," "so-called 'fighting words,' " "child pornography," "fraud," "true threats," and "speech presenting some grave and imminent threat the government has the power to prevent." United States v. Alvarez , 567 U.S. 709, 717, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012) (citations omitted). The Supreme Court has been reluctant to expand these categories of unprotected speech. See Stevens , 559 U.S. at 472, 130 S.Ct. 1577 ("Our decisions ... cannot be taken as establishing a freewheeling authority to declare new categories of speech outside the scope of the First Amendment.").
First Amendment principles apply with equal force to speech or expressive conduct on the Internet. There is "no basis for qualifying the level of First Amendment scrutiny that should be applied" to online speech. Reno v. Am. Civil Liberties Union , 521 U.S. 844, 870, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). No matter what changes occur to technology, "basic principles of freedom of speech ... like the First Amendment's command[ ] do not vary when a new and different medium for communication appears." Brown v. Entm't Merch. Ass'n , 564 U.S. 786, 790, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011)
*847 (internal quotation marks omitted) (citation omitted).
We fully acknowledge that bullying, stalking, and other forms of harassment are serious problems in our society. The Legislature's interest in protecting all Minnesotans, and particularly our more vulnerable neighbors, from such conduct is proper and serious. We also understand the challenge of narrowly crafting legislation that provides meaningful protection from bullying and harassment within the constraints of the First Amendment. And we certainly do not believe that crafting such legislation is impossible. See, e.g. , Rew v. Bergstrom , 845 N.W.2d 764, 776-80 (Minn. 2014) (upholding Minnesota's order for protection statute, Minn. Stat. § 518B.01, subd. 6a (2012), against a First Amendment prior restraint and facial invalidity challenge). Accordingly, we tread carefully as we balance the constitutional demands of the First Amendment against society's interest in protecting Minnesotans' safety, health, and welfare.
We may reverse a conviction for violating the First Amendment if we determine that the statute is unconstitutionally overbroad on its face. A statute may be facially overbroad in violation of the First Amendment when "it prohibits constitutionally protected activity, in addition to activity that may be prohibited without offending constitutional rights." State v. Machholz , 574 N.W.2d 415, 419 (Minn. 1998). Because of the fear of a "chilling effect" on speech, the traditional rules of standing have been altered in the First Amendment context to allow litigants to challenge statutes as unconstitutionally overbroad even when their own conduct could, consistent with constitutional requirements, be punished under a narrowly drawn statute. Id. ; see Broadrick v. Oklahoma , 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Therefore, A.J.B. may bring an overbreadth challenge to the two statutes at issue here regardless of whether his own expression falls outside of First Amendment protection.
"[T]he first step in an overbreadth challenge is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." Stevens , 559 U.S. at 474, 130 S.Ct. 1577 (quoting United States v. Williams , 553 U.S. 285, 293, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) ). Once we understand the scope and sweep of the statute, we ask whether its reach is limited to unprotected categories of speech or expressive conduct. State v. Hensel , 901 N.W.2d 166, 171 (Minn. 2017).
If we conclude that the statute is not limited to unprotected speech or expressive conduct, we turn to the core overbreadth inquiry: Does the statute prohibit a "substantial amount of constitutionally protected speech[?]" Id. at 171-72 (quoting Washington-Davis , 881 N.W.2d at 539 ); see Broadrick , 413 U.S. at 615, 93 S.Ct. 2908. This inquiry looks to the conduct that is criminalized by the statute-some of which is unprotected speech or conduct and some of which is speech and expressive conduct protected by the First Amendment-and asks whether the protected speech and expressive conduct make up a substantial proportion of the behavior the statute prohibits compared with conduct and speech that are unprotected and may be legitimately criminalized. See Broadrick , 413 U.S. at 615, 93 S.Ct. 2908 ("[P]articularly where conduct and not merely speech is involved ... the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."); see also Williams , 553 U.S. at 292, 128 S.Ct. 1830. A statute is not substantially overbroad merely because "one *848 can conceive of some impermissible applications." Williams , 553 U.S. at 303, 128 S.Ct. 1830 (internal quotation marks omitted) (citation omitted).
Finally, if we conclude that a statute prohibits a substantial amount of protected speech, we consider whether applying a narrowing construction or severing problematic language from the statute would remedy the constitutional defects. Hensel , 901 N.W.2d at 175. Our power to impose a narrowing construction on a statute is limited. While the canon of constitutional avoidance directs us to construe statutes to avoid meanings that violate constitutional principles, we remain bound by legislative words and intent and cannot rewrite the statute to make it constitutional. See State v. Luscher , 157 Minn. 192, 195 N.W. 914, 915-16 (1923) (rejecting a construction of a statute that would avoid a constitutional difficulty because the "language of [the statute] is so positive, clear, and unambiguous that it leaves no room for construction, and must be taken to mean what it says"). As we aptly stated in Hensel in rejecting a narrowing construction, "the shave-a-little-off-here and throw-in-a-few-words-there statute [resulting from a narrowing construction] may well be a more sensible statute, but at the end of the day, it bears little resemblance to the statute that the Legislature actually passed." 901 N.W.2d at 180.
We have broader authority when it comes to severance. Our goal is to "effectuate the intent of the legislature had it known that a provision of the law was invalid." State v. Melchert-Dinkel , 844 N.W.2d 13, 24 (Minn. 2014) (quoting State v. Shattuck , 704 N.W.2d 131, 143 (Minn. 2005) ). Further, we "presume that statutes are severable unless the Legislature has specifically stated otherwise." Id. (citing Minn. Stat. § 645.20 (2018) ).
Severing unconstitutional provisions is permissible unless we conclude that one of two exceptions applies. First, a statute cannot be severed if we determine that the valid provisions are so essentially and inseparably connected with, and so dependent upon, the void provisions that the Legislature would not have enacted the valid provisions without the voided language. Second, we are not to sever a statute if the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.
Id. (internal quotation marks omitted) (citations omitted).
If a statute is substantially overbroad, and unable to be saved by a narrowing construction or severance, "the remaining option is to invalidate the statute." Hensel , 901 N.W.2d at 175 (citing State v. Crawley , 819 N.W.2d 94, 105 (Minn. 2012) ).
With these principles in mind, we turn to whether Minn. Stat. § 609.749, subd. 2(6), or Minn. Stat. § 609.795, subd. 1(3), is overbroad.
I.
A.
We begin by interpreting the stalking-by-mail statute, Minn. Stat. § 609.749, subd. 2(6). Our goal in interpreting a statute is to ascertain the intent of the Legislature. State v. Henderson , 907 N.W.2d 623, 625 (Minn. 2018) ; see also Minn. Stat. § 645.16 (2018). Words used in a statute must be read in context. See Schmidt ex rel. P.M.S. v. Coons, 818 N.W.2d 523, 527 (Minn. 2012).
Minnesota Statutes § 609.749, subd. 2(6), provides:
*849 A person who stalks another by committing any of the following acts is guilty of a gross misdemeanor: ...
(6) repeatedly mails or delivers or causes the delivery by any means, including electronically, of letters, telegrams, messages, packages, through assistive devices for people with vision impairments or hearing loss, or any communication made through any available technologies or other objects[.]
(Emphasis added.) "Stalking" is defined as engaging "in conduct which the actor knows or has reason to know would cause the victim under the circumstances to feel frightened, threatened, oppressed, persecuted, or intimidated, and causes this reaction on the part of the victim regardless of the relationship between the actor and victim." Minn. Stat. § 609.749, subd. 1 (2018). The statute raises several interpretive questions.
First, subdivision 2(6) requires the State to prove that the defendant mailed, delivered, or caused the delivery of a communication. The word "delivered" has several commonly understood meanings. In the context of the stalking-by-mail provision, two definitions are worth consideration. The word "deliver" may mean "to take and hand over to or leave for another" as in "John delivered the package." Merriam Webster's Collegiate Dictionary 306 (10th ed. 1996). But the word may also mean to "speak, sing, or utter" as in "Jennifer delivered a fiery speech." Id. We interpret the word "deliver" as used in subdivision 2(6) to mean "to take and hand over to or leave for another." We do so because subdivision 2 specifically focuses on stalking "another," which suggests that the communication of the person doing the stalking must be directed at a specific person.[3]
Notably, while the stalking-by-mail provision generally prohibits a person from "engag[ing] in conduct," the specific conduct at issue in subdivision 2(6) is closely tethered to speech or expressive activities. Subdivision 2(6) prohibits mailing or delivering "letters, telegrams, messages, packages ... or any communication made through any available technologies or other objects ...." Minn. Stat. § 609.749, subd. 2(6). Four of the six items identified in the statute (letters, telegrams, messages, any communications) are purely expressive and the other two items (packages and other objects) may be expressive. Further, the statute's description of the type of communication that falls within its reach is stunningly broad. The statute applies to "any communication made through any available technologies." Id. The plain language of this phrase covers every type of communication without limitation.
Second, the State must prove that the defendant made the delivery "repeatedly." An action is done "repeatedly" when it is done "again and again." Merriam-Webster's Collegiate Dictionary , supra , at 991; see State v. Collins , 580 N.W.2d 36, 42 (Minn. App. 1998) (defining the word "repeatedly" in Minn. Stat. § 609.749, subd. 2(6), as "more than once"), rev. denied (Minn. July 16, 1998). The word "repeatedly" limits the reach of subdivision 2(6) because it carves out from criminal sanction those instances when a person delivers a communication that frightens, threatens, oppresses, persecutes, *850 or intimidates the recipient on a single occasion.
Third, the mens rea requirement built into the statute is broad. Subdivision 1 of section 609.749 provides that the defendant must "know[ ] or ha[ve] reason to know" that the communication would cause the victim "under the circumstances" to feel "frightened, threatened, oppressed, persecuted, or intimidated." The "knows or has reason to know" standard-a negligence mens rea-means a person may be convicted under subdivision 2(6) even though the person does not intend or even know that his communication would frighten, threaten, oppress, persecute, or intimidate the victim.[4] The breadth of the negligence standard is further expanded by the phrase "under the circumstances." Id. The phrase instructs that what the actor should have known about the victim's reaction must be judged relative to the existing conditions and the context of the communications (including the victim's specific circumstances) when made. See Circumstance , Black's Law Dictionary (10th ed. 2014) ("An accompanying or accessory fact, event, or condition, such as a piece of evidence that indicates the probability of an event."). In this case, for example, a communication that may not have caused many high school students to feel frightened or threatened may nonetheless have had that effect on M.B. because of his unique life circumstances.
The statute also requires proof of the victim's reaction. Minn. Stat. § 609.749, subd. 1. This added element limits the statute. However, the list of potential reactions is expansive, weakening the limiting nature of requiring proof of the victim's reaction. The statute criminalizes communications that cause a victim to feel physically or emotionally frightened (to be "fill[ed] with fear" or "alarm" or merely to "become afraid"), threatened ("feel[s] that his or her power, social standing, or self-esteem is in danger"), oppressed (feeling "worried or depressed"), persecuted ("oppress[ed] or harass[ed] with ill treatment" or "annoy[ed] persistently" or "bother[ed]"), or intimidated ("coerce[d] or deter[ed], as with threats"). The American Heritage Dictionary 703, 918, 1237, 1316, 1813 (5th ed. 2011) (defining "frighten," "threaten," "oppression," "persecution," and "intimidate"). None of these reactions is modified by an adverb (e.g., substantially, significantly) that would limit its scope. Further, the statutory language uses a subjective standard. The victim's feeling of fright, threat, oppression, persecution, or intimidation need not be objectively reasonable. See Minn. Stat. § 609.749, subd. 1.
Finally, we must consider the statute's "exception" subdivision. Minnesota Statutes § 609.749, subd. 7 (2018), provides:
Conduct is not a crime under this section if it is performed under the terms of a valid license, to ensure compliance with a court order, or to carry out a specific lawful commercial purpose or employment duty, is authorized or required by a valid contract, or is authorized, required, or protected by state, federal, or tribal law or the state, federal, or tribal constitutions.
This provision limits the scope of the stalking statute by exempting from its sweep several concrete and specific categories of conduct. The more general exemption for conduct and speech "authorized, required, *851 or protected by ... the state, federal, or tribal constitutions," id. , means that speech or expression protected by the First Amendment is categorically exempted from the reach of the stalking statute.
The exception from criminal prosecution under the statute for speech or expression protected by the First Amendment does not cleanse the statute of constitutional overbreadth concerns. In Machholz , we stated in dicta that the savings provision in subdivision 7 "cannot substantively operate to save an otherwise invalid statute, since it is a mere restatement of well-settled constitutional restrictions on the construction of statutory enactments." 574 N.W.2d at 421 n.4 (quoting Long v. State , 931 S.W.2d 285, 295 (Tex. Crim. App. 1996) (internal quotation marks omitted)). The Long decision cited in Machholz explained the rationale more fully:
Application of the [savings clause] on a case-by-case basis would require people of ordinary intelligence-and law enforcement officials-to be First Amendment scholars. Arguably, people are always "on notice" that constitutionally protected conduct is exempt from prosecution, and law enforcement officials could always look to the First Amendment to determine when a law should not be enforced because it would interfere with constitutionally protected activity. But, the mere existence of the First Amendment has never been held automatically to cure vagueness problems implicating First Amendment freedoms. Because First Amendment doctrines are often intricate and/or amorphous, people should not be charged with notice of First Amendment jurisprudence, and a First Amendment defense cannot by itself provide adequate guidelines for law enforcement. Moreover, an attempt to charge people with notice of First Amendment case law would undoubtedly serve to chill free expression.
931 S.W.2d at 295 (emphasis added) (footnote omitted).[5]
In other words, a statement in a criminal statute that a person cannot be prosecuted if the conduct is protected by the First Amendment does not remove the risk of chilling protected activities because the general public may not understand what speech is protected, particularly on the margins. Consequently, the constitutional risk to be avoided by the overbreadth doctrine is still present. Therefore, we conclude that the Machholz dicta is correct: the Legislature cannot save a statute that is otherwise unconstitutionally overbroad by including language stating that the statute does not reach speech or expression protected by the First Amendment.
In sum, subdivision 2(6) has a substantial sweep and it is tethered closely to speech or expressive conduct. It criminalizes the mailing or delivery of any form of communication that an actor directs more than once at a specific person who the actor "knows or has reason to know" would cause (after considering the victim's specific life circumstances) that person to feel "frightened, threatened, oppressed, persecuted, or intimidated" and the victim subjectively feels "frightened, threatened, oppressed, persecuted, or intimidated." Minn. Stat. § 609.749, subd. 1.
B.
Now that we have determined the meaning and scope of subdivision 2(6), we *852 must address the State's argument that the statute is not overbroad because it criminalizes only speech integral to criminal conduct. As the State properly notes, First Amendment protections do not extend to speech that "is intended to induce or commence criminal activities." State v. Muccio , 890 N.W.2d 914, 923 (Minn. 2017) (quoting United States v. Williams , 553 U.S. 285, 298, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) ).
We have held that statutes criminalizing the use of the Internet or an electronic device to engage in communications with a child that relate to or describe sexual conduct and the intentional solicitation of prostitution fall within the category of "speech integral to criminal conduct." Muccio , 890 N.W.2d at 925 ; Washington-Davis , 881 N.W.2d at 538. In each case, we concluded that the speech at issue was unprotected because it was "directly linked to and designed to facilitate the commission of a crime." Washington-Davis , 881 N.W.2d at 538-39 (noting that the statute at issue regulated speech that solicits women to be prostitutes, which has no lawful purpose but rather is aimed at furthering the commission of a crime); see Muccio , 890 N.W.2d at 925 (holding that communication with a child that describes sexual conduct as part of a sexual predator's grooming process targeted a specific child with the goal of enticing the child to engage in later criminal acts); see also Williams , 553 U.S. at 297, 128 S.Ct. 1830 (upholding a law that prohibited offers to provide or requests to obtain child pornography because child pornography is illegal and "offers to engage in illegal transactions are categorically excluded from First Amendment protection"); Giboney v. Empire Storage & Ice Co. , 336 U.S. 490, 498-502, 69 S.Ct. 684, 93 L.Ed. 834 (1949) (holding that picketing was not protected by the First Amendment when the "sole, unlawful immediate objective was to induce [the target of the picketing] to violate the Missouri law" because the speech was "used as an integral part of conduct in violation of a criminal statute").
On the other hand, we held in Melchert-Dinkel that speech advising, encouraging, or assisting another to commit suicide was not speech integral to criminal conduct because the act advocated for-suicide-is not illegal. 844 N.W.2d at 20. In so holding, we rejected as "circular" the State's argument that we should "uphold[ ] the statute on the ground that the speech prohibited by [the statute] is an integral part of a violation of [the statute]." Id. In other words, "[i]t is not enough that the speech itself be labeled illegal conduct .... Rather, it must help cause or threaten other illegal conduct ... which may make restricting the speech a justifiable means of preventing that other conduct." Eugene Volokh, The "Speech Integral to Criminal Conduct" Exception , 101 Cornell L. Rev. 981, 1011 (2016).
The speech criminalized in subdivision 2(6) does not fit within the category of speech integral to criminal conduct. The statute criminalizes the communication itself; it does not criminalize the communication because its only purpose is to induce or commence a separate crime. Further, as more fully described in the next section, even if subdivision 2(6) reaches some speech or expressive conduct that falls within the category of speech integral to criminal conduct, the statute also reaches conduct that does not fall into that unprotected category. Consequently, we must address the next step of the overbreadth inquiry.
C.
We now turn to the heart of the overbreadth challenge: Does subdivision 2(6) prohibit a substantial amount of constitutionally *853 protected speech judged in relation to the statute's plainly legitimate sweep? See Williams , 553 U.S. at 292-93, 128 S.Ct. 1830 (citing Broadrick , 413 U.S. at 615, 93 S.Ct. 2908 ). We conclude that it does.
We return to the language of the statute. As we stated earlier, the statute is broad in its reach and the proscribed conduct is primarily focused on either speech or expressive activity. See Minn. Stat. § 609.749, subd. 2(6) (defining the criminalized conduct as mailing or delivery of "letters, telegrams, messages, packages, or any communications"). And although the statute may proscribe some conduct that is not protected by the First Amendment (for example, repeated delivery of a package containing a white powder), the broad reach of the statute is not limited to non-expressive and unprotected conduct. Cf. Hensel , 901 N.W.2d at 171 ; Machholz , 574 N.W.2d at 420. Consider the following examples.
A vocal and well-known constituent delivers four or five letters over the course of two weeks to a local city councilperson saying, "I hate your position on gun control and I will organize a campaign to unseat you!" The letters make the city councilperson feel that his or her power, social standing, or self-esteem is in danger. It causes the councilperson to worry or feel depressed and intimidated so as to deter the councilperson from pursuing the gun-control measure. Further, the constituent should know that the letters would cause that effect; it is, in fact, the whole point of sending the letters. Finally, the speech does not fall within one of the specific categories excepted from criminalization in Minn. Stat. § 609.749, subd. 7. No one would dispute that the constituent's letters reside at the core of protected First Amendment speech, but those communications fall within the plain language of subdivision 2(6).
A group of protesters legally gather for a few hours in front of the local bakery every Friday for several weeks. The protesters carry signs stating that if the baker does not change his policy of refusing to sell wedding cakes to gay couples, they will boycott his business and tell all their friends to do so as well. The signs cause the baker to feel persecuted for his beliefs and worried and concerned that he will lose his business. Much like the letter example, the protesters gather at the bakery knowing (and indeed, intending) that outcome to be the effect of their protest. Again, the protesters' behavior is protected speech, yet the communications fall within the scope of subdivision 2(6).
The statute's constitutionality is not saved by protesting that the government would never charge someone under the stalking-by-mail statute for the examples of speech described above. As the Supreme Court observed, the First Amendment "protects [us] against the Government; it does not leave us at the mercy of noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." Stevens , 559 U.S. at 480, 130 S.Ct. 1577.
The expansiveness of many elements of the crime further supports the conclusion that subdivision 2(6) reaches too much constitutionally protected speech compared with the amount of constitutionally unprotected speech and conduct the statute reaches. Hensel provides insight on this point. In Hensel , a woman disrupted a city council meeting with signs that blocked the view of council proceedings from other attendees. 901 N.W.2d at 169. The woman was charged with disorderly conduct under Minn. Stat. § 609.72, subd. 1(2) (2018): "Whoever [disturbs an assembly or meeting]
*854 in a public or private place ... knowing or having reasonable grounds to know that it will, or will tend to, alarm, anger or disturb others or provoke an assault or breach of the peace is guilty of disorderly conduct ...." In concluding that the statute was unconstitutionally overbroad, we relied heavily on the expansive words used by the Legislature:
The statute sets forth its mens-rea element in the introductory clause, which requires the offender to "know[ ], or hav[e] reasonable grounds to know that [the activity] will, or will tend to, alarm, anger or disturb others or provoke and assault or breach of the peace." Under the statute, therefore, even negligent activity will subject an individual to criminal liability. The actus-reus element is even broader. Although an individual can commit disorderly conduct in a number of ways, the disturbance-of-a-meeting-or-assembly statute prohibits any act that "disturbs an assembly or meeting, not unlawful in its character."
The use of the word "disturb" in the statute to describe the actus-reus element does not place any meaningful limitation on the statute's scope.... The statute's attendant-circumstance element, which requires the disturbance to occur at a "meeting" or "assembly," also does not limit the breadth of the statute in any significant way.
Hensel , 901 N.W.2d at 172 (alterations in original) (citations omitted); see also Machholz , 574 N.W.2d at 420 (holding that a harassment statute that criminalizes "any and all intentional conduct causing a reasonable person to feel oppressed, persecuted, or intimidated" is overbroad because "[t]he statute's language sweeps in a whole spectrum of constitutionally protected activity beyond the category of fighting words" (emphasis omitted)).
The stalking-by-mail statute uses similarly expansive language. As in Hensel , the statute subjects even negligent conduct to criminal sanction. Minn. Stat. § 609.749, subds. 1-1a. The statute is focused primarily on speech and expressive conduct and broadly includes "any communication" within its scope. Id. , subd. 2(6). The statute further describes the actus-reus element with several broad and unqualified terms: frighten, threaten, oppress, persecute, or intimidate. Id. , subd. 1. These terms do not "place any meaningful limitation on the statute's scope." Hensel , 901 N.W.2d at 172.
In determining the reach of Minn. Stat. § 609.749, subd. 2(6), it is instructive to compare the Minnesota statute with the federal stalking statute. The federal law penalizes whoever,
with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that (A) places that person in reasonable fear of the death of or serious bodily injury to [the] person or a [family member]; or (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to [the] person [or a family member].
18 U.S.C. § 2261A(2) (2018).
Several federal courts have concluded that the federal stalking statute is not constitutionally overbroad. See, e.g. , United States v. Ackell , 907 F.3d 67, 77 (1st Cir. 2018), cert. denied , --- U.S. ----, 139 S.Ct. 2012, --- L.Ed.2d ---- (2019) ; United States v. Gonzalez , 905 F.3d 165, 192 (3d Cir. 2018) petition for cert. filed (May *855 10, 2019); United States v. Osinger , 753 F.3d 939, 944 (9th Cir. 2014) ; United States v. Sayer , 748 F.3d 425, 435 (1st Cir. 2014) ; United States v. Petrovic , 701 F.3d 849, 856 (8th Cir. 2012). The differences between the federal stalking statute and the Minnesota stalking-by-mail statute shed light on why subdivision 2(6) is overbroad.
First, the federal statute applies only when a person acts with "an intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, harass, or intimidate another person[.]" 18 U.S.C. § 2261A(2). This "malicious intent" requirement figures prominently in federal courts' decisions finding that the federal stalking statute is not overbroad. See Ackell , 907 F.3d at 74 (noting that the statute targets conduct with "serious criminal intent"); Osinger , 753 F.3d at 944 (noting that the statute requires "malicious intent" (citations omitted)); Sayer , 748 F.3d at 435 (noting that the statute "clearly targets conduct performed with serious criminal intent, not just speech that happens to cause annoyance or insult"); Petrovic , 701 F.3d at 856 (noting the "malicious intent" requirement in the federal stalking statute). In contrast, Minnesota's stalking-by-mail statute criminalizes communications even when the person does not know-much less intend-that the communication will frighten, threaten, oppress, persecute, or intimidate the victim. As we noted in Hensel , the Legislature's adoption of a negligence standard "allows the statute to reach all types of acts, intentional or not, that have a tendency to disturb others. The statute's inclusion of a negligence standard makes it more likely that the statute will have a chilling effect on expression protected by the First Amendment." 901 N.W.2d at 174.
Second, the breadth of the categories of victim reactions also differentiates subdivision 2(6) from the federal stalking statute. The federal statute requires proof that a person's conduct placed the victim or the victim's family member in "reasonable fear of [ ] death [ ] or serious bodily injury" or "causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress" to the victim or a family member of the victim. 18 U.S.C. § 2261A(2)(A)-(B). The "substantial" harm requirement is significant to federal courts that have upheld the federal stalking statute against an overbreadth challenge. See, e.g. , Petrovic , 701 F.3d at 856 (discussing the paired "malicious intent" and "substantial harm" elements of the federal stalking statute and noting that because both are required "[i]t is difficult to imagine what constitutionally-protected ... speech would fall under these statutory prohibitions" (internal quotation marks omitted) (citation omitted)). The "substantial" harm to the victim required under the federal stalking statute is more serious than the type of subjective harm that is required by subdivision 2(6).
Finally, the federal statute reaches far more unprotected speech and conduct than subdivision 2(6). In other words, the "legitimate sweep" of the federal statute is larger. As the First Circuit noted in Ackell , the federal statute reaches conduct unprotected by the First Amendment such as repeatedly infecting a victim's computer with viruses, opening unwanted online dating profiles under the victim's identity, and taking out unwanted loans in the victim's name. See 907 F.3d at 73 ; see also Osinger , 753 F.3d at 947 (noting that the statute was violated in part when the defendant set up a fake Facebook page of the victim); Petrovic , 701 F.3d at 860 (noting that the statute was violated in part when the defendant set up a website with dozens of images of the victim engaging in sex acts and other embarrassing personal information). Subdivision 2(6), which is limited to *856 mail and delivery of primarily expressive content (letters, telegrams, messages, packages, any communications), does not reach nearly as much non-expressive or unprotected conduct. Consequently, the proportion of overall behavior prohibited by subdivision 2(6) that is protected speech and expressive conduct is much greater compared with the sweep of conduct legitimately prohibited by the statute than is the case under the federal statute.
Due to the substantial ways in which subdivision 2(6) can prohibit and chill protected expression, we conclude that the statute facially violates the First Amendment overbreadth doctrine.
D.
Having concluded that Minn. Stat. § 609.749, subd. 2(6), prohibits too much constitutionally protected speech, we consider whether we can limit the scope of the statute so as to remedy the constitutional defects. See Hensel , 901 N.W.2d at 175.
The State suggests that we excise the words "or has reason to know" from the statute. See Minn. Stat. § 609.749, subd. 1. By so doing, the statute would transform from one under which a person who does not know or intend his communication to frighten, threaten, oppress, persecute, or intimidate the victim may be criminally prosecuted, to one where the person must at least "know" that the communication would have that effect. The statute's reach would be accordingly limited.[6]
We cannot rewrite the statute to narrow it as the State suggests for the simple reason that it would be "inconsistent with the statute's text." Hensel , 901 N.W.2d at 179. It would require us to " 'perform[ ] ... plastic surgery upon the face of the [statute],' rather than just adopting an alternative, reasonable construction of the statute's actual words." Id. at 176-77 (quoting Shuttlesworth v. City of Birmingham , 394 U.S. 147, 153, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) ).
We can, however, consider whether it is proper to sever the negligence standard from Minn. Stat. § 609.749, subd. 2(6). As noted earlier, we presume unconstitutional language is severable unless the valid provisions of the statute are so "essentially and inseparably connected with" the void provisions that the Legislature would not have enacted the valid provisions without the void language, or where (after severance) the remaining valid language would be "incomplete and ... incapable of being executed." Melchert-Dinkel , 844 N.W.2d at 24 (internal quotation marks omitted) (citation omitted). We conclude that there are legitimate reasons to doubt that the Legislature would have enacted Minn. Stat. § 609.749, subd. 1, without the negligence standard.
One piece of evidence is subdivision 1a, which added suspenders to the "knows or has reason to know" belt of subdivision 1 by reiterating that proof of specific intent is not required under the statute. Minn. Stat. § 609.749, subd. 1a ("[T]he state is not required to prove that the actor intended to cause the victim to feel frightened, *857 threatened, oppressed, persecuted, or intimidated, or except as otherwise provided ... that the actor intended to cause any other result."). Although not specifically addressing a "knowing" standard, subdivision 1a demonstrates that the Legislature wanted the mens rea standard to be low. Indeed, subdivision 1a was added to the statute almost immediately following our decision in State v. Orsello , where we held that the stalking statute required specific intent. 554 N.W.2d 70, 76 (Minn. 1996) ; Act of May 6, 1997, ch. 96, § 7, 1997 Minn. Laws 694, 700 (adding subdivision 1a to the stalking statute). The Legislature's reaction to Orsello is strong evidence of its desire to maintain a low mens rea in the stalking statute.
Second, due to the structure of the statute, which places the definition of stalking in its own separate subdivision, the negligence standard applies not only to cases brought under subdivision 2(6), but also to every other type of conduct identified in subdivision 2 of the stalking statute. See Minn. Stat. § 609.749, subd. 2(1)-(5), (7)-(8). Yet, if we were to eliminate the negligence standard and require a higher level of intent for subdivision 2(6), we would also impose a more demanding mens rea requirement for other acts of stalking that may not raise First Amendment concerns. For instance, there may be no First Amendment concerns with a negligence standard when the stalking conduct involves "return[ing] to the property of another if the actor is without claim of right to the property or consent of one with authority to consent." Id. , subd. 2(3). Accordingly, it is not obvious that the Legislature would have enacted the statute by requiring proof that a person who, for example, returned to another's property did so intentionally or recklessly. The Legislature may want a person who negligently returns to another's property to be subject to criminal prosecution.
In any event, we need not resolve whether the exception to the presumption of severance applies in this case because even if we were to require an actor to "know" that his communication would frighten, threaten, oppress, persecute, or intimidate the victim, subdivision 2(6) remains unconstitutionally broad. Each of the examples of protected speech identified above that the statute covers would continue to fall within the reach of subdivision 2(6) under a "knowing" standard. Therefore, we conclude that Minn. Stat. § 609.749, subd. 2(6), is not reasonably subject to a narrowing construction. Accordingly, the only "remaining option is to invalidate the statute." Hensel , 901 N.W.2d at 175. We therefore hold that Minnesota Statutes § 609.749, subd. 2(6) (2018), is facially overbroad and thus violates the First Amendment to the United States Constitution.
II.
A.
We turn next to the mail-harassment statute. Minnesota Statutes § 609.795, subd. 1(3), provides:
Whoever does any of the following is guilty of a misdemeanor: ...
(3) with the intent to abuse, disturb, or cause distress, repeatedly mails or delivers or causes the delivery by any means, including electronically, of letters, telegrams, or packages.
A few interpretative observations are in order. First, like the stalking-by-mail statute, the conduct made illegal in subdivision 1(3) is closely connected to expressive activity. It is focused on the delivery of letters and telegrams (both purely expressive conduct) as well packages (which may be expressive).[7]
*858 Further, subdivision 1(3) sets forth a specific-intent crime. The statute criminalizes behavior only when the actor intends to cause a specific type of harm. The State correctly asserts that the specific-intent element limits the sweep of this statute because it excludes knowing or negligent acts from the statute's reach.
The next interpretive step is to examine the type of harm that the actor intends to cause. Here the reach of the statute broadens. Subdivision 1(3) allows prosecution where the actor intends to "abuse, disturb, or cause distress." Minn. Stat. § 609.795, subd. 1(3) (emphasis added). The use of the disjunctive "or" means that proof of any of those intended reactions, standing alone, is sufficient for conviction. State v. Loge , 608 N.W.2d 152, 155 (Minn. 2000) (describing how "two alternate concepts" in a statute were "separated by the disjunctive 'or,' " which "require[s] that only one of the possible factual situations be present in order for the statute to be satisfied").
Because the statute does not define "abuse," "disturb," or "distress," we look to dictionary definitions for guidance while keeping in mind the context of the statute which is focused on the intent of the person sending and the reactions of the person receiving letters, telegrams, or packages. See Shire v. Rosemount, Inc. , 875 N.W.2d 289, 292 (Minn. 2016) ; see also City of Brainerd v. Brainerd Invs. P'ship , 827 N.W.2d 752, 760 (Minn. 2013) (Anderson, J., dissenting) ("[W]e must not look simply at a dictionary definition .... Instead, we must assess whether applying the dictionary definition makes sense in context."). "Abuse" in this context means maltreatment, including assailing or threatening with insulting or hurtful words primarily aimed to injure or harm the recipient. See The American Heritage Dictionary , supra , at 8 (defining "abuse" as, among other things, "[t]o assail with insulting or hurtful words" or "[i]nsulting or hurtful language"); see also Garner's Dictionary of Legal Usage 10 (3d ed. 2011) (defining "abuse" as, among other things, "to deal with in a harmful or wrongful way ... [with] injurious results"); Abuse , Black's Law Dictionary (10th ed. 2014) (defining "abuse" as "physical or mental maltreatment, often resulting in mental, emotional, sexual, or physical injury"). "Disturb" in this context means "to break up or destroy the tranquility, order, or settled state," or "to trouble emotionally; upset." The American Heritage Dictionary , supra , at 525. Finally, "cause distress" in this context means to cause "strain, anxiety or suffering." Id.
Unlike the stalking-by-mail provision or the federal stalking statute, Minn. Stat. § 609.795, subd. 1(3), does not require that the victim actually suffer harm or experience *859 abuse, distress, or disturbance. Compare 18 U.S.C. § 2261A, and Minn. Stat. § 609.749, subd. 2(6), with Minn. Stat. § 609.795, subd. 1(3). The actor need only intend that the victim suffer the harm.
Combining the terms of the statute, then, subdivision 1(3) criminalizes three behaviors:
1. Repeatedly delivering a letter, telegram, or package with an intent to abuse (maltreating a victim including by assailing or threatening with insults or hurtful words primarily aimed to injure or harm) even if the recipient is not abused.
2. Repeatedly delivering a letter, telegram, or package with an intent to disturb ("to break up or destroy the tranquility, order, or settled state of" or "to trouble emotionally or mentally; upset") even if the recipient is not disturbed.
3. Repeatedly delivering a letter, telegram, or package with an intent to cause distress (cause "strain, anxiety, or suffering") even if the recipient is not distressed.
See Minn. Stat. § 609.795, subd. 1(3). It is under this plain reading of subdivision 1(3) that we consider A.J.B.'s overbreadth challenge to the mail-harassment statute.
B.
The State argues that Minn. Stat. § 609.795, subd. 1(3), reaches only speech integral to criminal conduct because repeatedly delivering messages to the victim that the actor intends to cause the victim to feel abused, disturbed, or distressed is illegal in Minnesota. This argument, as noted above, is circular-the speech covered by the statute is integral to criminal conduct because the statute itself makes the conduct illegal. That is not the test for speech integral to criminal conduct. See Melchert-Dinkel , 844 N.W.2d at 20 (rejecting the same argument as "circular").
Further, subdivision 1(3) reaches some constitutionally protected speech or expressive conduct. As just one example, sending letters, telegrams, or packages (physically or electronically) lies at the heart of our democracy. The United States Senate alone received 6.4 million letters in 2016, a number that does not include telegrams or e-mails to Senators or any communications to the United States House of Representatives, the President, state governors and legislatures, or mayors or city councilpersons.[8] A major reason for mailing those letters is to "disturb," that is, to "break up or destroy the tranquility, order, or settled state of" the circumstances that provoked the constituent to act. Put simply, a constituent letter is one method by which an elected official is prompted to act. Further, the letter-writers do not infrequently use insulting or hurtful words. Similarly, a series of letters directed to a controversial religious or political leader that challenges the legitimacy of the leader's beliefs is covered by the statute.[9]
C.
Because those protected communications fall within the scope of *860 Minn. Stat. § 609.795, subd. 1(3), we must turn to the next step of the overbreadth inquiry: Does Minn. Stat. § 609.795, subd. 1(3), prohibit a substantial amount of constitutionally protected speech judged in relation to the statute's plainly legitimate sweep? We conclude that it does.
The State focuses on the elements of the statute that, it argues, limit the statute's scope. First, the State asserts that the statute is not substantially overbroad because the statute is limited to regulating "mainly" the conduct of mailing and delivering. We disagree. We cannot focus myopically on the conduct of mailing and delivering, and ignore the contents of what is being mailed or delivered. Subdivision 1(3) regulates primarily expressive conduct-the mailing and delivery of letters, telegrams, or packages.
The State also points out that because the statute applies only when the actor "repeatedly" mails or delivers letters, telegrams, or packages, the scope of the statute is limited. It is certainly true that because some people will mail only one letter intended to disturb as opposed to more than one letter, fewer people will be covered by the mail-harassment statute. But that is not our central inquiry. The critical question is whether the limitation reduces the scope of speech or expressive conduct reached by the statute relative to unprotected expression or non-expressive conduct. The State fails to explain why a requirement that the mailing or delivery occur more than once results in the exclusion of a significant amount of protected speech while the "repeatedly" element leaves most unprotected speech and conduct within the statute's ambit.
The State's strongest argument is that the mail-harassment statute requires proof of specific intent. Under certain circumstances, a specific-intent requirement may sufficiently limit the reach of a statute into protected speech and expressive conduct to avoid overbreadth. Muccio , 890 N.W.2d at 928. Still, the existence of a specific-intent element does not end the analysis. For overbreadth purposes, the critical question is whether the specific-intent element carves out substantial protected speech and expressive conduct that would otherwise have fallen within the terms of the statute while leaving properly criminalized conduct within the statute's prohibition. See id. (concluding that a statute's specific-intent element sufficiently narrows the reach of the statute to "some, but relatively few, communications" entitled to First Amendment protection).
A comparison of this case with Muccio and Machholz is instructive. In Muccio , we held that Minn. Stat. § 609.352, subd. 2a(2) (2018), was not overbroad. 890 N.W.2d at 929. We observed that the "legitimate sweep" of the statute was "to protect children from sexual abuse and exploitation and from exposure to harmful sexual material." Id. at 928. It prohibited an adult from participating in the electronic transmission of information relating to or describing the sexual conduct of any person, if the communication was directed at a child and the adult sending the communication acted with the specific intent to arouse the sexual desire of any person. Id. at 922 (citing Minn. Stat. § 609.352, subd. 2a(2) ).
We concluded that the requirement of a specific intent to arouse sexual desires excluded from the reach of the statute instances of protected speech (discussions of safe sex practices or artistic images that include nude subjects) that would otherwise be covered by the statute in the absence of the specific-intent requirement. Id. at 928. In other words, a statute that merely prohibited an adult from participating in the electronic transmission of information *861 relating to or describing the sexual conduct of any person if the communication was directed at a child would have criminalized a substantial amount of protected speech. The addition of the specific-intent requirement tightly focused the sweep of the statute on the harm to be prohibited.[10] Id.
The specific-intent element in the mail-harassment statute does not carve out protected speech or expressive conduct in the same way. Mailing letters to an elected official advocating for a change of law may very well be sent with an intent to "abuse" or "disturb" the elected official or "cause distress." Mailing letters to a controversial religious or political leader challenging the beliefs of that leader similarly may be sent with an intent to abuse, disturb, or cause distress. But the letters are protected by the First Amendment.
In this way, the mail-harassment statute is more like the harassment statute at issue in Machholz . In Machholz , we assessed the constitutionality of a harassment statute that prohibited a person from engaging in conduct that interferes with another person or intrudes on the person's privacy or liberty by engaging in "intentional conduct in a manner that ... would cause a reasonable person under the circumstances to feel oppressed, persecuted, or intimidated" and "causes [such] on the part of the victim." 574 N.W.2d at 418 (quoting Minn. Stat. § 609.749, subd. 1(1) (1996) ). We held that the statute was overbroad because "[t]he statute's language sweeps in a whole spectrum of constitutionally protected activity." Id. at 420. The "intentional conduct" element was not a sufficient limitation to save the statute. See id. at 420-21 (noting that even with the inclusion of an "intent" standard, the various examples of protected expressive conduct "would run afoul of the statute").
In addition, the limiting effect of the specific-intent requirement is counterbalanced by the absence in subdivision 1(3) of any requirement that the victim actually suffer any harm. The only legitimate purpose in prohibiting the mailing or delivering of letters, telegrams, or packages with the intent to abuse, disturb, or cause distress is to prevent those harms from occurring. By foregoing any requirement that the harm actually occur, the Legislature criminalized behavior, including substantial speech and expressive conduct, that will have no impact on the legitimate purpose of the statute: to prevent the harm.[11]
Finally, we consider the breadth of the categories of harm covered by the statute when determining whether the statute sweeps in substantial protected speech and expressive conduct. For instance, in Hensel , we considered an overbreadth challenge to a disorderly conduct statute that prohibited " 'disturb[ing]' assemblies or meetings." 901 N.W.2d at 169 (quoting Minn. Stat. § 609.72, subd. 1(2) (2016) ). One reason for our conclusion that the statute was overly broad was that the "use of the word 'disturb' in the statute to describe the actus-reus element does not *862 place any meaningful limitation on the statute's scope." Id. at 172. We said that proscribing speech or expressive conduct that simply disturbed others can chill protected expression in "countless ways." Id. at 173 ; see also In the Matter of the Welfare of S.L.J. , 263 N.W.2d 412, 419-20 (Minn. 1978) ("While it is true that no ordered society would condone the vulgar language used by this 14-year-old child, and as the [juvenile] court found, her words were intended to, and did, arouse resentment in the officers, the constitution requires more before a person can be convicted for mere speech."). Indeed, the First Amendment "itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs" such that the "Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it." Stevens , 559 U.S. at 470, 130 S.Ct. 1577 ; see City of Houston v. Hill , 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (" 'Speech is often provocative and challenging.... [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.' " (quoting Terminiello v. Chicago , 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (alterations in original))); Coates v. City of Cincinnati , 402 U.S. 611, 615, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) ("The First and Fourteenth Amendments do not permit a State to make criminal the exercise of the right of assembly simply because its exercise may be 'annoying' to some people.").
We reach the same conclusion for subdivision 1(3). The terms used by the statute are broad. Delivering a letter that tells an elected official that the sender will take action to defeat him in the next election if he does not take action on gun control or a letter that threatens a boycott if a baker does not change his policy of refusing to sell wedding cakes to gay couples could certainly be done with the intent to disturb, "to break up or destroy the tranquility, order, or settled state," or "to trouble emotionally [or] upset." The term "cause distress" is similarly far-reaching. The point of mailing the letters just mentioned is often precisely to cause distress, strain, anxiety, or suffering in order to prompt action. But those letters are certainly protected by the First Amendment and a law that criminalizes mailing or delivering a letter that disturbs or causes distress will have a substantial chilling effect on protected speech and expressive conduct. The First Amendment's shield from criminal prosecution is not lowered merely because an individual's speech is provocative, challenging, or offensive. See Hill , 482 U.S. at 461, 107 S.Ct. 2502.
Because subdivision 1(3), criminalizes the delivery of letters, telegrams, or packages with the intent to abuse, disturb, or cause distress, we conclude that the statute prohibits a substantial amount of constitutionally protected speech.
D.
Having concluded that subdivision 1(3) prohibits a substantial amount of constitutionally protected speech, we consider whether a narrowing construction or severance can save the statute.
The State urges us to eliminate the constitutional problems with subdivision 1(3) by severing the term "disturb" from the statute. We agree that eliminating the term "disturb" narrows the statute and eliminates from its scope a substantial amount of protected speech and expressive conduct that would otherwise be criminalized. Because we conclude, however, that the phrase "cause distress" is at least as *863 broad and unlimited as "disturb," severing the word "disturb" without also severing the phrase "cause distress" will not solve the overbreadth flaw in the statute. Consequently, we consider whether we can sever both phrases.
We presume unconstitutional language is severable unless the valid and invalid provisions of the statute are so "essentially and inseparably connected" that the Legislature would not have enacted the valid provisions without the void language, or where (after severance) the remaining valid language would be "incomplete and ... incapable of being executed." Melchert-Dinkel , 844 N.W.2d at 24 (internal quotation marks omitted) (citation omitted). Neither exception applies here. First, the three categories of intended harm are listed in the disjunctive; therefore, a person can be convicted if any one of the categories of harm is intended. Consequently, the requirement that a letter be mailed with an "intent to abuse" is not so essentially and inseparably connected with, and so dependent upon, the alternative categories of harm (that a letter be mailed with an "intent ... to disturb" or "intent ... to cause distress") that the Legislature would not have enacted the valid provision without enacting the other two. Stated another way, we conclude that the Legislature would have enacted a statute that criminalized only the mailing or delivery of a letter with an "intent to abuse" if it had recognized the constitutional flaws inherent in the broader language it enacted. Second, a statute that reads, "whoever ... with the intent to abuse, repeatedly mails or delivers or causes the delivery, by any means, including electronically, of letters, telegrams, or packages" is guilty of a crime, is not incomplete and is perfectly capable of being executed in accordance with the legislative intent. "[D]isturb" and "cause distress" may therefore be severed.
Does that remedy the constitutional overbreadth defect that we have found in the statute? We believe it does. Certainly, the terms "disturb" and "distress" could include expressive activity that would also constitute abuse. But unlike the terms "disturb" and "distress," the term "abuse" is more narrowly cast and the injury intended much more substantial. For abuse to occur as the term is used in subdivision 1(3), the primary aim of the maltreatment, including through the use of insulting or hurtful words, must be mental, physical, or emotional injury or harm. And while we acknowledge that proscribing the delivery of letters, telegrams, or packages with the intent to abuse the recipient may still chill speech, it chills much less protected speech than the statute pre-severance. Further, in the context of preserving democratic interactions, there is less-if any-need to "abuse" an elected official, public figure, or neighbor, to achieve democratic purposes. The abuse of a recipient of a letter, telegram, or package has more serious consequences and its prohibition is more tightly focused on protecting individuals from serious harm than merely being disturbed or distressed.
In sum, we sever the words "disturb" and "cause distress" from subdivision 1(3). The remaining statute proscribes repeatedly mailing, delivering, or causing the delivery, "by any means, including electronically, of letters, telegrams, or packages," with "the intent to abuse," that is, the intent of maltreating the recipient including through the use of insulting or hurtful words with the primary aim of causing mental, physical, or emotional injury or harm. Minn. Stat. § 609.795, subd. 1(3). Because the surviving statute is therefore not substantially overbroad, we conclude that the State may still constitutionally prosecute a person for mailing or delivering a letter, telegram, or package with the intent to abuse the recipient.
*864 III.
We now turn to the application of our holdings to A.J.B.'s constitutional challenges to his delinquency adjudications.[12] Because we hold that Minn. Stat. § 609.749, subd. 2(6), is unconstitutionally overbroad, and not subject to a narrowing construction, we reverse A.J.B.'s delinquency adjudication under that provision.
We also reverse A.J.B.'s adjudication under Minn. Stat. § 609.795, subd. 1(3), and remand to the juvenile court for consideration under the statute as narrowed by our decision. The juvenile court concluded that "the State has proven beyond a reasonable doubt that [A.J.B.] intended to abuse, disturb or cause M.B. distress" with his Twitter posts. (Emphasis added.) We cannot discern from the juvenile court's decision whether A.J.B. was adjudicated delinquent for intending to abuse M.B., intending to disturb M.B., or intending to cause M.B. distress.[13] Because A.J.B.'s delinquency adjudication under Minn. Stat. § 609.795, subd. 1(3), may rest on portions of the statute that we severed, the juvenile court must now determine, based on the record before it, whether A.J.B.'s adjudication of delinquency for mail harassment can stand under the statute as narrowed. See Melchert-Dinkel , 844 N.W.2d at 25 (reversing and remanding after modifying a statute to remedy overbreadth defects).
CONCLUSION
For the foregoing reasons, we reverse A.J.B.'s adjudications of delinquency under Minn. Stat. §§ 609.749, subd. 2(6), and 609.795, subd. 1(3). We remand to the juvenile court for consideration of A.J.B.'s adjudication under Minn. Stat. § 609.795, subd. 1(3) as narrowed.
Reversed.
Concurring in part, dissenting in part, Chutich, Hudson, McKeig, JJ.
CONCURRENCE & DISSENT
CHUTICH, Justice (concurring in part, dissenting in part).
I agree with the majority that the stalking-by-mail provision, Minnesota Statutes section 609.749, subdivision 2(6) (2018), is *865 facially overbroad, cannot be narrowed, and is thus unconstitutional. I also agree that the mail-harassment statute, Minnesota Statutes section 609.795, subdivision 1(3) (2018), is overbroad as written and that the words "disturb" and "cause distress" must be severed from that subdivision.
Having agreed with the central conclusions of the court's opinion, I write separately, however, on the disposition of the appeal. In my view, the case need not be remanded to the juvenile court because the juvenile court's factual findings, when applied to the requirements of the newly narrowed statute, demonstrate beyond a reasonable doubt that A.J.B. specifically intended to abuse M.B. I therefore respectfully dissent from Part III of the majority's opinion, in which it reverses A.J.B.'s adjudication and remands to the juvenile court for reconsideration. As explained below, I would affirm A.J.B.'s adjudication under section 609.795, subdivision 1(3), as narrowly construed.
Under our court's construction of section 609.795, subdivision 1(3), the statute now provides in relevant part: "Whoever does any of the following is guilty of a misdemeanor: ... (3) with the intent to abuse, repeatedly mails or delivers or causes the delivery by any means, including electronically, of letters, telegrams, or packages." We define an "intent to abuse" as an intent "to maltreat[ ] the recipient including through the use of insulting or hurtful words with the primary aim of causing mental, physical, or emotional injury or harm."
When a question arises about the application of the law to undisputed facts, we review the issue de novo. State v. Bakken , 883 N.W.2d 264, 270 (Minn. 2016). Accordingly, applying the juvenile court's factual findings to the clarified "intent to abuse" element of the mail-harassment statute, I conclude that the juvenile court properly adjudicated A.J.B. delinquent, not just of intending "to disturb" M.B. or to cause him "distress," but also of intending "to abuse" M.B.
First, the juvenile court made explicit findings about the intent of A.J.B. in creating this tweet storm of 40 posts, all of which specifically tagged M.B.'s Twitter handle. The juvenile court found that A.J.B.'s "messages were directed at M.B." and that A.J.B. "wanted to teach M.B. a lesson." The juvenile court cited the credible sworn testimony of B.L., a friend of A.J.B.'s, who testified that A.J.B. created the anonymous twitter account to "harass and demean M.B." The juvenile court specifically found that A.J.B.'s "motivation for sending the tweets was to target and make fun of M.B.'s disability and the characteristics he exhibits because of the disability." The juvenile court concluded that "[t]here is overwhelming evidence that the posts were made with the intent to harass and demean M.B. because of his disability, Autism."
The juvenile court's findings described the nature of the 24 posts that were received into evidence, and the record includes pictures of the posts. Several of A.J.B.'s tweets, when examined together, illustrate an intent to threaten M.B. The juvenile court's findings quote one post as stating, "@ [tagging M.B. at his Twitter handle] the bouncer when [M.B.] tries to walk into the club" and described the picture underneath: "an adult male with his hand out in front of him with the phrase 'GAYS NOT WELCOME.' " The juvenile court described another post that had "a picture of a girl and 'Faggot' is in a black bar over her eyes. It says underneath the picture: '@ [M.B.'s Twitter handle] what girls at your school think when they see you in class.' " These two tweets, implying that M.B. was gay, were the set-up for an explicit threat, which came in another post.
*866 That post included a picture of a sign stating "DEATH PENALTY FOR FAGS."
Several more of A.J.B.'s Twitter posts evince an intent "to assail with insulting or hurtful words" and "harm" M.B. by implying that he should commit or encouraging him to commit suicide. One post stated, "consider suicide." Another post, displaying an image of a pencil, said, "The pencil has more to live for than you tho." A third post stated, "You should try a new cologne called 'Anthrax' it'll attract any girl to LOVE you! Google around ;)." A similar post included a picture of scientist Bill Nye and the text "[c]onsider the following." Underneath that picture is another picture of Bill Nye holding up a bottle of Clorox bleach. The juvenile court found that "[t]he posts suggested 6 times that M.B. had nothing to live for and should commit suicide." The court again cited the credible testimony of B.L. that A.J.B. engaged "in this behavior to harass and demean M.B."
Yet another post included, as the juvenile court described, "a picture of a baby carved and mutilated in a bucket filled with blood. The baby had a cigarette butt in its mouth. The post said something similar to 'parents would have wished' in relation to M.B." The juvenile court noted that "[b]oth M.B. and his mother testified that they could still remember that picture," and that M.B. testified "that it scared him."
Although the mail-harassment statute does not require that the victim of the abusive behavior actually suffer from any harm, our definition of abuse states that messages delivered with an intent to abuse have "the primary aim of causing mental, physical, or emotional injury or harm." Here, the juvenile court found that these tweets harmed M.B. mentally and emotionally:
M.B. and his mother testified credibly that M.B. was crying, contemplated suicide, was scared, and was upset as a result of the tweets. They created a safety plan so that someone was with M.B. throughout the day because they were concerned for M.B.'s safety.... After discovering the posts, M.B. continuously looked over his shoulder afraid someone was going to hurt him. M.B. started going to a social worker, psychiatrist and Fraser [a social service agency] for extra support.
In rejecting A.J.B.'s defense that these posts were just mean and were not criminal, the juvenile court stated that the posts "are cruel and go beyond any measure of human decency. They barrage a disabled young man who already suffers on numerous fronts with demeaning messages both directly and publicly. They then tell him his life is not worth living and instruct him to kill himself."
These comments of the juvenile court, its findings concerning A.J.B.'s intent to harass and demean M.B., it findings concerning the content of the tweets, and its findings concerning the injurious results of A.J.B.'s tweet storm upon M.B. show that all three of the then-specific intent requirements of the mail-harassment statute were more than satisfied, i.e., "intent to abuse, disturb, or cause distress." Because the more strict requirements of "intent to abuse" were met, it matters not that we have subsequently severed the other two descriptions of specific intent. In other words, giving the findings of the juvenile court due weight, and honoring its credibility determinations, the juvenile court clearly found that A.J.B. specifically abused M.B. See In re Welfare of T.N.Y. , 632 N.W.2d 765, 768 (Minn. App. 2001) ("On appeal from a determination that each of the elements of a delinquency petition have been proved beyond a reasonable doubt, an appellate court is limited to ascertaining *867 whether, given the facts and legitimate inferences, a fact-finder could reasonably make that determination." (internal quotation marks omitted) (citation omitted)); see also Minn. R. Juv. Delinq. P. 16.01 (stating that a child in a delinquency proceeding may seek a new trial if "the finding that the allegations of the charging document are proved is not justified by the evidence").
The majority primarily relies on State v. Melchert-Dinkel to support its conclusion that we must remand this case to the juvenile court after narrowing a statute upon which a conviction was based. 844 N.W.2d 13 (Minn. 2014). Melchert-Dinkel is readily distinguishable, however. There, we narrowed a statute making it illegal to "intentionally advise[ ], encourage[ ], or assist[ ] another in taking the other's own life" by striking the words "advises" and "encourages" from the statute. Id. at 24 (narrowing Minn. Stat. § 609.215, subd. 1 (2012) ). Notably, the district court had previously "made no findings as to whether [the defendant's] actions also constituted assisting the victims in taking their own lives." Id. at 25 (emphasis added). Because we concluded that (1) the term "assists" "signifies a level of involvement in the suicide beyond merely expressing a moral viewpoint or providing general comfort or support," id. at 23 ; (2) the "assists" language was the only portion of the statute that remained after we struck the language "advises" and "encourages," id. at 24 ; and (3) the district court found only that "Melchert-Dinkel 'intentionally advised and encouraged' [the suicide victims] in taking their own lives," we remanded the case to the district court for further proceedings, id. at 25.
Here, unlike Melchert-Dinkel, the juvenile court's findings did not specifically rest on only two of three possible and distinct ways of committing the offense, each of which was then severed from the criminal statute by our court. Even acknowledging that the surviving element here-"intent to abuse"-"signifies a level of involvement" beyond merely intending to disturb or to distress M.B., I am certain that the juvenile court's findings of fact and conclusions of law support A.J.B.'s delinquency adjudication under our narrowing construction. Cf. State v. Mauer , 741 N.W.2d 107, 116 (Minn. 2007) (remanding to the district court "[b]ecause we cannot be certain that the district court's findings of fact and conclusions of law would support [the defendant's] conviction under our narrowing construction of 'reason to know ...' ").
The language used by the juvenile court in its findings-intent to target, teach a lesson, harass, demean-fits the definition of abuse set forth in this opinion: "to maltreat[ ] a victim including by assailing or threatening with insults or hurtful words primarily aimed to injure or harm." Accordingly, A.J.B.'s adjudication can and should stand; a remand is unnecessary and is a waste of judicial resources. Given the overwhelming evidence of A.J.B.'s abusive tweets, threatening violence, encouraging suicide, and otherwise demeaning and harassing a vulnerable M.B., I respectfully dissent from the court's reversal of A.J.B.'s delinquency adjudication under the mail-harassment statute.
HUDSON, Justice (concurring in part, dissenting in part).
I join in the concurrence and dissent of Justice Chutich.
MCKEIG, Justice (concurring in part, dissenting in part).
I join in the concurrence and dissent of Justice Chutich.

Twitter users can tweet "at" another user (also called "mentions") by putting the other person's username in the content portion of a tweet. The "mentioned" user receives a notification that the user has been mentioned. A.J.B. did not send any Twitter "direct messages" to M.B. A direct message is a private communication between two Twitter users.

The juvenile court stayed the adjudication of delinquency on the felony stalking count.

The handing over or leaving for another need not be in person. The statute expressly provides that delivery may occur "electronically" and by "any available technologies." Minn. Stat. § 609.749, subd. 2(6). Further, the delivery of the communication need not be private; a communication made in public may nonetheless be directed at a specific person.

The Legislature's intent to create a broad mens rea standard is made clear in Minn. Stat. § 609.749, subd. 1a (2018). That provision of the stalking statute provides that the State has no obligation to prove a specific intent by the defendant to cause the victim to feel frightened, threatened, oppressed, persecuted, or intimidated or to cause any other result. Id.

Long addressed a vagueness challenge under the First Amendment, not an overbreadth challenge. 931 S.W.2d at 287. Even so, in Machholz we implicitly recognized that the same concerns about the savings clause expressed in Long also apply in the overbreadth context.

The State does not argue that we can insert a malicious-intent standard into the statute that would mirror the federal stalking statute. Appropriately so because such a position is inconsistent with the text of Minn. Stat. § 609.749, subd. 1a, which expressly provides that "[i]n a prosecution under this section, the state is not required to prove that the actor intended to cause the victim to feel frightened, threatened, oppressed, persecuted, or intimidated ...." A narrowing construction that would add an intent element is therefore not feasible. Further, the word "intent" is nowhere to be found in the definition of stalking in Minn. Stat. § 609.749, subd. 1. Accordingly, whether through a narrowing construction or severance, we cannot modify the statutory language to reach that result.

We observe that the nature of the acts covered by subdivision 1(3) (mailing or delivering) and the items to be delivered (letters, telegrams, or packages) suggest that the statute proscribes only direct personal contacts between two individuals. The parties, however, take the position that the statute also applies to a series of tweets, a form of communication that is distributed broadly and publicly. Although M.B. is mentioned by A.J.B. in the tweets with the purpose that M.B. actually see the tweets, the tweets could be viewed by many others besides M.B. In fact, a person uses Twitter as opposed to some other form of electronic communication (e.g., e-mail, Twitter direct messages) because the person intends to communicate a message to more than the intended target. A.J.B., however, does not challenge the State's implicit characterization of a tweet as a letter, telegram, or package. Accordingly, we do not reach the issue of whether a tweet is a "letter, telegram, or package" under Minn. Stat. § 609.795, subd. 1(3). Further, we assume for the purpose of this decision that the statute is not limited to direct person-to-person conduct. Finally, we conclude that even if subdivision 1(3) were limited to direct person-to-person conduct, the statute would remain overbroad for the reasons set forth in the opinion.

See Kathryn Schulz, Call and Response , The New Yorker, Mar. 6, 2017, at 27.

If we accept the State's position that Minn. Stat. § 609.795, subd. 1(3), applies to Twitter posts that mention an individual but are distributed to a broader public audience, then the statute covers significantly more protected speech. So, even a tweet or Facebook post about the President's position on a controversial issue that uses disturbing or abusive language and mentions or tags the President would be covered by the statute. Cf. United States v. Cassidy , 814 F. Supp. 2d 574, 585-86 (D. Md. 2011) (noting that Twitter functions as a sort of "bulletin board" whereby messages may, but need not, be read by the public even when another user is mentioned).

Our conclusion that the statute in Muccio was not overbroad was further undergirded by another element of the crime; namely, that the communication be directed at a specific child. Id. at 928. That was important because it narrowed the scope of the statute to the harm to be prevented-child abuse. In contrast, Minn. Stat. § 609.795, subd. 1(3), applies broadly to any person.

As noted earlier, federal courts have found that the "malicious intent" requirement is a significant reason why the federal stalking statute is not overbroad. That analysis was paired, however, with the further determination that violations of the federal stalking statute also caused "substantial harm." See, e.g. , Petrovic , 701 F.3d at 856.

A.J.B. also argues that both statutes are unconstitutional violations of the First Amendment as applied to him. We need not reach the argument with regard to Minn. Stat. § 609.749, subd. 2(6), because we have concluded that the statute is facially unconstitutional. We do not reach the argument with regard to Minn. Stat. § 609.795, subd. 1(3), because we remand to the juvenile court.

We agree with the concurrence and dissent's discussion of the derogatory and insulting nature of A.J.B.'s tweets. However, the serious nature of A.J.B.'s tweets cannot overcome doubt regarding a juvenile court's disjunctive findings of law, especially in the severance context. In the past, where we have severed some-but not all-of the terms of a statute as unconstitutional, and where the district court's findings of law did not definitively establish that the conviction squarely rested on the surviving language, we have remanded. See Melchert-Dinkel , 844 N.W.2d at 24-25. In fact, in a prior First Amendment case in which we narrowed the scope of a statute, we held that where "we cannot be certain that the district court's findings of fact and conclusions of law would support [the defendant's] conviction under our narrowing construction ... the district court is in the best position to review the record and reach a conclusion" under the now-narrowed statute. State v. Mauer , 741 N.W.2d 107, 116 (Minn. 2007) ; see also Astleford Equip. Co., Inc. v. Navistar Int'l Transp. Corp. , 632 N.W.2d 182, 193 (Minn. 2001) (noting that "[w]e also conclude that now that we have articulated the standard to be used when applying [the statute at issue], the district court is in the best position to review the record and its findings and to reach a conclusion" on the matter). Consequently, a remand is the appropriate outcome here.